IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER LEE CRAWFORD,

    Petitioner,

    v.

ANTHONY HEDGPETH, Warden,

    Respondent.
_____/

No. C 08-2690 CW

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

    Petitioner Christopher Lee Crawford is a prisoner of the State of California, incarcerated at Kern Valley State Prison. On May 28, 2008, Petitioner filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the validity of his 2005 state conviction. Respondent filed an answer on December 4, 2008. Petitioner filed a traverse on April 15, 2009. Having considered all of the papers filed by the parties, the Court DENIES the petition for writ of habeas corpus.

BACKGROUND

I.  Procedural History

    On July 15, 2005, an Alameda County superior court jury convicted Petitioner of one count of first degree murder, California Penal Code § 187(a). The jury also found the allegation

of personal use of a knife to be true, California Penal Code § 12022(b)(1). On September 23, 2005, the trial court sentenced Petitioner to twenty-six years to life in prison.

Petitioner timely appealed to the California court of appeal, claiming that there were two reversible errors at trial. On March 15, 2007, the court of appeal filed a written opinion rejecting one of Petitioner's claims and agreeing with the other. Resp.'s Ex. 7. The court of appeal reversed Petitioner's first degree murder conviction on insufficiency of the evidence grounds and directed the State to either re-try Petitioner or allow the trial court to modify Petitioner's sentence to reflect a second degree murder conviction. Id. at 21. Petitioner proceeded to the California Supreme Court, which denied his petition in a one sentence order on May 23, 2007. Resp.'s Ex. 9. On September 5, 2007, after the State declined to re-try Petitioner, the trial court modified Petitioner's first degree murder conviction to a second degree murder conviction and reduced Petitioner's sentence to sixteen years to life. Resp.'s Ex. 10.

II. Statement of Facts

In its written opinion on direct review, the California court of appeal summarized the factual background as follows:

> Freeman Ray Bain, Jeff Smith and appellant, all homeless, lived in "Root Park," by the San Leandro Creek and saw each other daily. Bain and Smith were friends; they spent time talking, smoking crack and drinking together. Bain met appellant a couple of years before the trial, when appellant camped a few feet away from him, and the two talked and drank together. Bain had shoulder injuries and could not defend himself physically; both Smith and appellant had, on occasion, stepped in to tell others to leave Bain alone. When Bain wanted to purchase crack cocaine, he would take a bus to Walnut Street in Oakland. Several times Bain had taken appellant with him for protection, repaying appellant by buying him beer. Bain and appellant sometimes got into

2

arguments when they drank.

On July 21, 2004, Bain went with Michael Hern to a plaza near Root Park where Bain liked to "hang out" and drink. They were drinking "211," a malt liquor with higher alcohol content than regular beer that Bain and Smith both favored. Carlos Sotelho was also present. After about two hours, during which time Bain drank three or four beers, Smith arrived with appellant. Smith was holding two boxes, one containing an open buck knife (exh. No.1C) and the other a pocket watch. Smith showed the men the items but would not let anyone touch them. Sotelho testified that appellant several times said angrily that he wanted the knife. Smith said "no," also in an angry tone. Appellant then stopped asking. Both Sotelho and Bain testified that they did not see appellant touch the knife.

Bain testified that Smith mentioned he and appellant were going to Oakland to buy drugs and invited Bain to accompany them. Smith said he was going to trade the knife and watch for narcotics. Bain did not want to go with appellant, but did intend to go to Oakland to buy a rock of crack cocaine. He did not leave with Smith and appellant but ended up on the same bus as them anyway. Bain got off at 100th Avenue and walked toward Walnut. Smith and appellant were about half or three quarters of a block behind him. It was dark but the street lights were on. Up to this point, Bain had not heard any arguments or observed any problems between Smith and appellant.

Bain crossed Holly Street then, after walking about half a block, looked back and saw a van stop at Holly and 100th and Smith and appellant stop at the driver's window. Bain stopped, wondering whether the others were getting crack from the van and whether he could as well. After a few minutes, Smith and appellant walked away from the van. Smith still had the boxes in his hands; appellant had nothing in his. Smith did not appear to be having problems walking and was not holding his neck. Bain could hear appellant's voice "kind of loud," as though he was getting upset at Smith, but could not understand what he was saying. Bain could see Smith smiling, shaking his head "no," but appellant looked upset. He heard appellant yelling at Smith for about 60 to 90 seconds, then turned the corner on Walnut, where he quickly purchased a rock of cocaine and put it in his mouth.

Bain started back to the bus stop and when he reached the corner of 100th, saw Smith on his knees, with his forehead on the sidewalk, a lot of blood underneath him, and appellant standing over him. Appellant was asking Smith, "are you bleeding from the mouth?" Smith said "yes," and appellant said, "Jeff, get up, let me take you home." Smith said "no." Bain saw that appellant had a knife in his right hand and saw the box with the watch in it open near Smith's head. He did not see the box the knife had been in. Scared, Bain walked by without stopping. He saw a woman across the street,

3

"hysterical," talking on the phone to 911, and thought it would be best to get away. He was concerned because he had the cocaine in his mouth and, having seen appellant with the knife, because "I could have been next." From the bus stop, he saw police arrive at the scene.

Athalia Goldsby was at her mother's house at 5145 100th Avenue at about 10:00 p.m. on July 21, 2004. Goldsby's mother said she heard someone yelling for help, and Goldsby followed her outside. When she reached the front gate, about 17 feet from the front door, Goldsby saw a man on the ground in front of the house next door and another man running across the street in the direction of the liquor store saying "'help my friend.'" She had not heard anyone saying anything before she reached the gate. The man on the ground was on his knees, with one hand around his throat and the other on the ground. He was bleeding from his throat and coughing, and there was a lot of blood on the ground. Goldsby saw a knife on the ground a couple of inches from the victim's head. She tried to call 911 from her cell phone, then successfully reached 911 from the liquor store's cordless phone. The second man came back across the street, saying, "'[h]urry up, hurry up, you all going to let my friend die. You all going to let my friend die.'" The tape of Goldsby's call was played for the jury. Other than her family members, the people who worked in the liquor store and the two men she described, Goldsby did not see anyone in the area.

At about 10:30 p.m. on July 21, 2004, about two minutes after receiving a call reporting a "man down" on the 1500 block of 100th Avenue, Oakland Police Officers Holly Hart and Herbert Webber arrived almost simultaneously in front of 1509 100th Avenue, where they found a man lying on his back in a pool of blood, with blood around his mouth. Hart could see blood coming from his mouth, but could not see whether he was bleeding from his neck; Webber could not locate a wound. Appellant was standing over the victim and yelling that the owners of the nearby liquor store were not allowing him to call "911." The victim's breathing was "shallow" and he had a faint pulse. On the ground in the area of the victim's head, there were two opened jewelry cases (exh. No.6A) and an open folding knife with blood on the handle and blade (exh. Nos.1C, 8A) and a white visor. A rock of cocaine was subsequently found in the pool of blood.

When Hart first arrived and asked what happened, appellant said that he and his friend had just gotten off the bus when his friend started coughing up blood; his friend had not been stabbed and must have had a heart attack. Appellant, agitated and pacing on the sidewalk, repeated several times that the victim had not been stabbed and must have had a heart attack. Appellant also told Hart that he and his friend had been with a third male, who had run away from the scene when the victim started throwing up blood.

4

Webber transported appellant to the police station. On the drive, appellant volunteered that the victim had started coughing up blood as they were walking down the street and must have had a heart attack, and continued to express anger at the liquor store owners for not letting him call 911.

The police evidence technician who processed the scene found no blood between the corner of Holly and 100th Avenue and the crime scene. The fingerprints taken from the knife found at the scene were of poor quality and could not be compared to appellant's or Smith's.

The forensic pathologist who performed the autopsy testified that Smith died from a stab wound to the neck. The stab wound penetrated one- to one and a half inches beneath the skin and involved the branches of the major blood vessel in the neck, the left external carotid artery. The wound caused blood to flow into the throat or mouth and into the lungs, which would interfere with breathing and might cause the victim to cough up blood, and to bleed from the neck and nose. The pathologist found no indication Smith had had a heart attack. The knife found at the scene (exh. No.1C) was consistent with the type of instrument that could have caused the stab wound. The pathologist testified that it would be possible for a person stabbed in the way Smith was to continue walking for a distance of 50 yards, and possible that blood would not have spurted out from the wound. He also testified that morphine can act as a painkiller, so a person with morphine in his or her system might feel less pain from a wound than one without morphine. The pathologist observed scarring on Smith's body consistent with skin grafts, which could be consistent with heroin use.

Oakland Police Officers Brian Medeiros and Gus Galindo interviewed appellant at the police station from 2:44 to 3:31 a.m. This interview was not recorded. Appellant was informed of his Miranda [footnote omitted] rights and waived them. The police later conducted a taped interview from 6:02 a.m. until 6:28 a.m.

Appellant told the police he had known Smith for about a year, saw him about five days a week and did not have any problems with him. Appellant said he and Smith took the bus to Oakland because Smith wanted to sell a knife and a watch set; it was Smith's idea to go. As they walked along 100th Avenue, a van stopped at the intersection of Holly and 100th Avenue, and Smith unsuccessfully attempted to sell the knife and watch set. Appellant said Smith went to the passenger side of the van and talked across the female passenger to the male driver. Appellant said there were no problems or disputes with the van's occupants. When the van pulled away and they continued walking, Smith said he had just bought drugs. Ray Bain, who was walking ahead of them, turned onto Walnut. Suddenly, appellant said, Smith fell down and started coughing up blood. Appellant "figured he was havin' a massive heart attack or

5

somethin'. Blood clot." Appellant said his mother had coughed up blood during a heart attack. Appellant said he got blood on his shoes and on his wrist, but wiped the latter off.

Sergeant Medeiros testified that during the first interview, when he suggested Smith might have been stabbed, appellant repeatedly insisted this had not happened, even when Medeiros said Smith had a stab wound to his neck. In the taped interview, as well, appellant stated that Smith had not been stabbed. Appellant stated that his fingerprints would be on the knife because he had handled it at the plaza and that Carlos Sotelho and Michael Hern would have seen him touch the knife. He denied being drunk or having taken any drugs during the time he was in Oakland with Smith, and denied arguing with Smith. Appellant said Bain could be located at the encampment in Root Park.

Meanwhile, after leaving Oakland, Bain returned to Root Park and told Richard Bittner he had seen Smith bleeding and Bittner should tell Cindy, Smith's girlfriend. Bain did not mention having seen appellant with a knife. Bain smoked his cocaine with Richard, then drank two more beers.

Later that night, the police came to Root Park. Bittner woke Bain and told him Smith was dead. At their request, Bain went with the police to the station for questioning. The police read Bain his Miranda rights, then asked him what had happened. Bain was not concerned that he might be a suspect; he acknowledged that he thought the police might think he had stabbed Smith but said he did not feel scared because he knew he had not done so. He related the events but left out having seen appellant with a knife in his hands. Asked again what had happened, he again left out this fact. At some point in the conversation, Bain told the police he was scared that appellant might get out of jail and they assured him appellant "'would be put away for a while.'"  At this point, Bain said he had seen appellant with a knife. Bain was scared of retaliation from appellant because appellant had threatened him before. The police took photographs of Bain, then took him back to the park.

Sergeant Medeiros, who interviewed Bain, testified that Bain first stated he did not see any objects in appellant's hands, then described hearing appellant yelling at Smith as they were walking, started to cry and said he saw appellant standing above the victim holding a knife. Bain said he had not mentioned the knife earlier because he was afraid appellant would beat him up.

Bain testified that a couple of weeks before Smith's death, appellant had told him, "'[i]f you ever want to stick someone, take them to Oakland. You'll get away with it.'"  Bain took the term "sticking" to mean "stabbing." Appellant had generally said he would like to "stick" "[a]nybody that pisses him off."

6

Susan Fehn knew the homeless people in San Leandro and allowed them to come to her house to wash clothes, shower and watch television. About three months before the stabbing, appellant, whom she had known for years, stayed with her for about four days, taking care of her while she was sick with the flu. FN3. One night appellant came back to the house very late, with a beer, a crack pipe and a half a joint, saying he had been at a party and was loaded. Very agitated, appellant said Smith owed him $10 and the next time he saw Smith he was going to stab him. Fehn did not take appellant seriously because he was high. Appellant lit his crack pipe and Fehn got angry and asked him to leave. Appellant got "really angry" and scared Fehn "a little bit," but she did not think he was going to hurt her and he left with no violence. She never mentioned his threat to anyone.

FN3. Fehn initially testified that this occurred two weeks before the stabbing, then heard a tape in which she told the police it was three months before.

Fehn considered appellant a friend and felt "really torn" about testifying against him. At the time of trial, Fehn was in custody due to an "open container" violation of probation for being drunk in public. She stated that she was only an occasional drinker, but acknowledged having been arrested at least three times that year for public drunkenness. Stating that she never drank enough to become drunk, Fehn testified that there was a particular police officer who wanted to run homeless people out of town, hated her and repeatedly arrested her when she had not done anything. It was stipulated that Fehn had a blood alcohol level of 0.299 on December 26, 2004, that she was treated for symptoms of alcohol withdrawal on October 26, 2004, that her blood tested positive for cocaine on September 26, 2003, and that she had a blood alcohol level of 0.301 on August 19, 2003. The trial court noted that 0.299 and 0.301 were approximately three and a half times the legal limit for driving impairment. At the arraignment on her June 14, 2005 public intoxication arrest, Fehn told the judge she was a "star witness in a case for the prosecution."

Fehn had been diagnosed with bipolar disorder in 1996, for which she took prescription medication, but she testified she had phased out the medication and no longer needed it because the disorder had gone away. Asked whether it had been explained to her that bipolar disorder is biological, Fehn responded, "Of course. I went to medical school." She then clarified that she had studied psychology to become a therapist, explaining that she considered the program medical school. She had not yet gotten her degree. She acknowledged having been taken to a psychiatric facility once due to a call from her sister, whom she said hated her, but said she had been released after a few hours. On another occasion, she had taken herself to a psychiatric facility because she was feeling "schizo" after a good friend died; again, she had been released after a few hours.

7

> Appellant did not testify at trial and the defense did not present any witnesses. In argument, defense counsel told the jury appellant was innocent and the police had arrested the wrong person, suggesting appellant's behavior was inconsistent with guilt and Smith could have been stabbed by someone in the van or accidentally stabbed himself. Defense counsel noted that Smith, not appellant, had suggested the trip to Oakland, and that appellant, if he had stabbed Smith, would not have chosen to commit the crime on a street where witnesses would be likely or left the knife to be found by the police, would have run (as Bain did) rather than stay to help the victim, and would not have cooperated with the police and told them where to find Bain and other witnesses or mentioned to the police that he had wiped blood off his wrist. Counsel suggested that Smith could have been stabbed by someone in the van and still walked to where he fell without leaving a trail of blood, noting that the stab wound was not immediately obvious and that the stabbing could have happened too quickly for appellant to see. Alternatively, defense counsel suggested Smith could have stumbled, fallen on the knife and not immediately noticed, as Smith's use of alcohol, heroin and other drugs would have lessened his sensitivity to pain. Counsel argued that the prosecution witnesses were unreliable: Bain was an alcoholic and crack user who realized he was in the wrong place at the wrong time, whose perception and recollection could be affected by his substance abuse, and who changed his stories to police; while Fehn was bipolar, denied her obvious abuse of alcohol, suffered from faulty memory and enjoyed her perceived role as "star witness" for the prosecution.

Resp.'s Ex. 7 at 2-10.

## LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

8

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). The first prong applies both to questions of law and to mixed questions of law and fact, id. at 407-09, and the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El, 537 U.S. at 340. A petitioner must present clear and convincing evidence to overcome the presumption of correctness under § 2254(e)(1); conclusory assertions will not do. Id. Although

9

only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir. 2003).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" <u>Penry v. Johnson</u>, 532 U.S. 782, 795 (2001) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991). In the present case, the California court of appeal is the highest court that addressed Petitioner's claims.

## DISCUSSION

Petitioner supports his petition for a writ for habeas corpus with two claims: (1) his conviction for first degree murder is not supported by sufficient evidence, and (2) the trial court violated his right to confrontation and cross-examination when it limited his questioning of Ray Bain.

I.  Sufficiency of the evidence

Petitioner claims that there was insufficient evidence to convict him of first degree murder because there was no evidence to demonstrate premeditation or deliberation. As Respondent points out, Petitioner's first degree murder conviction was overturned by the California court of appeal. The federal court is "without

10

power to decide questions that cannot affect the rights of the litigants before them." North Carolina v. Rice, 404 U.S. 244, 246 (1971) (per curiam). Further, a case becomes moot if "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Murphy v. Hunt, 455 U.S. 478, 481 (1984). The reversal of Petitioner's first degree murder conviction renders Petitioner's insufficiency of the evidence claim moot. Thus, Petitioner's claim is denied because there is no longer a case or controversy.

II.  Right to confrontation and cross-examination

Petitioner claims that the trial court erroneously prohibited him from cross-examining Bain about two prior incidents in which Bain changed his story to the police. Petitioner wanted to use these incidents as evidence of Bain's character and habit. Regarding the first incident, Petitioner wanted to question Bain about an unrelated physical altercation in which Bain pulled a knife on the victim. When Bain was initially questioned by the police, Bain did not mention the knife at all. In the second incident, police were investigating a domestic dispute between Bain and his girlfriend. When police asked Bain if he was under the influence of any drugs, Bain denied that he was, and then later admitted that he had smoked rock cocaine. The trial court denied Petitioner's request, stating that the incidents were "too peripheral." Reporter's Transcript ("RT") at 501.

The Confrontation Clause does not prevent a trial judge from imposing reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety, repetition or irrelevance. Delaware v. Van Arsdall, 475 U.S. 673,

11

679 (1986).  The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam).  A defendant meets his burden of showing a Confrontation Clause violation by showing that "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility . . . had counsel been permitted to pursue his proposed line of cross-examination."  Van Arsdall, 475 U.S. at 680; Slovik v. Yates, 556 F.3d 747, 753 (9th Cir. 2009).

The California court of appeal resolved this claim as follows:

> In the present case, appellant sought to cross-examine Bain about two prior incidents in which he had allegedly lied to the police during investigation of an offense, then admitted self-incriminating facts. Appellant sought to demonstrate that Bain had a history of changing his stories to the police, presumably in attempts to protect himself. "Evidence of specific instances of conduct is admissible to attack the credibility of a witness. (Evid.Code, § 1101, subd. (c).)" (People v. Kennedy (2005) 36 Cal.4th 595, 634.)
>
> Respondent maintains the trial court acted within its discretion in refusing to permit this cross-examination because the evidence would have been cumulative, since Bain admitted that he initially failed to tell the police about seeing appellant with the knife, and would have consumed undue time. Respondent is incorrect on both counts. Although Bain admitted changing his story to the police in the present case, he testified that the reason he did so was fear of appellant-- he told the police about the knife only after being assured that appellant would be incarcerated "for a while." This explanation, of course, only served to further incriminate appellant. Appellant, however, argued that Bain changed his story because he was afraid the police were viewing him as a suspect: he wanted to protect himself by bolstering the case against appellant. Although Bain denied this, the theory that Bain feared he was being seen as a suspect was not far-fetched: Bain was taken to the police station, read his Miranda rights and questioned for a lengthy period. The evidence of Bain's past lies to the police would have supported the defense theory by demonstrating that Bain had a habit of lying to the police to protect himself, and might have given the jurors a basis for doubting Bain's testimony about seeing appellant with the knife, if not his testimony as

12

> a whole.
>
> Nor is there reason to believe the cross-examination would have been unduly time consuming. If Bain admitted the past falsehoods, no more than a few questions would have been required. If he did not, at worst appellant might have presented brief testimony from the officers involved in the two past incidents. It is difficult to imagine how more than a few questions would have been required to make the point.
>
> Bain was a critical witness in this case. In addition to his testimony regarding appellant's preoffense statements, Bain was the only witness who claimed to see appellant with the knife in his hand after Smith was stabbed. His testimony in this regard, however, was undermined by Goldsby's: Bain testified that when he walked by the scene of the stabbing, there was a woman across the street calling 911, but Goldsby testified that when she came out of her house, appellant was already running around trying to get help for Smith. Although appellant was able to challenge Bain's credibility both by evidence of his changed story in the present case and, more generally, his substance abuse, the evidence appellant sought to present was clearly relevant.
>
> Nevertheless, we cannot view the error in limiting cross-examination as prejudicial. With respect to a conviction for second degree murder, the importance of Bain's testimony was his report of having seen appellant standing over Smith with a knife in his hand. As previously discussed, Bain's credibility was squarely challenged on this specific point, as well as in general. There is no question appellant was with Smith when he was stabbed: The only theories offered to the jury that could have absolved appellant of guilt altogether were that Smith was stabbed by a person in the van or that Smith accidentally stabbed himself. Both theories border on the incredible. We recognize there was some evidence to suggest they were not impossible scenarios--evidence that the neck wound would not necessarily have resulted in a trail of blood from the van to the spot where Smith fell, and that Smith's drug use might have kept him from feeling the initial pain of the wound. The question, however, is whether a reasonable juror may have held a reasonable doubt as to appellant's guilt of second degree murder. Even without Bain's testimony, it is virtually inconceivable the jury would not have found appellant guilty of this lesser offense.

Resp.'s Ex. 7 at 19-21.

Even assuming that Petitioner's right to confrontation and cross-examination was violated, he is not entitled to federal habeas relief unless the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Holley v.

13

1  Yarborough, 568 F.3d 1091, 1100 (9th Cir. 2009) (quoting Brecht v.
2  Abrahamson, 507 U.S. 619, 637 (1993)).  When cross-examination on a
3  proper subject is denied, the court should assume that the damaging
4  potential of the cross-examination would be fully realized and then
5  determine, in light of the importance of the witness' testimony in
6  the entire case, the extent of the cross-examination otherwise
7  permitted and the overall strength of the prosecution's case.  See
8  United States v. Miguel, 111 F.3d 666, 671-72 (9th Cir. 1997)
9  (citing Delaware v. Van Arsdall, 475 U.S. at 684).  A review of the
10 record shows that even if Petitioner had been able to cross-examine
11 Bain with regard to those two incidents, it would not have had a
12 substantial effect on the verdict.
13      The jury was aware that Bain had been inconsistent in his
14 statements to the police regarding this case.  Sergeant Medeiros,
15 who interviewed Bain at the police station, testified that Bain
16 initially did not mention that he saw Petitioner holding a knife.
17 RT at 667.  Bain also admitted at trial that he initially did not
18 tell the police that he saw Petitioner with a knife.  RT at 483-84.
19 As the California court of appeal noted, Bain's testimony was
20 important because of his statement that he saw Petitioner standing
21 over the victim with a knife in his hand.  Even if the jury
22 disbelieved Bain's testimony, it would have had to conclude that
23 either someone in the van, or the victim himself, or some other
24 unknown person stabbed the victim in the neck and killed him.  The
25 state court was not unreasonable in deciding that, even if the jury
26 disbelieved Bain's testimony, in light of the remaining evidence at
27 trial, these defense theories were incredible.
28

14

CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied.

No certificate of appealability is warranted in this case. See Rule 11(a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring district court to rule on certificate of appealability in same order that denies petition). Petitioner has failed to make a substantial showing that any of his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claims debatable or wrong. See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment and close the file. All pending motions are terminated. Each party shall bear his own costs.

IT IS SO ORDERED.

Dated: February 22, 2011

CLAUDIA WILKEN
United States District Judge

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER L. CRAWFORD, | Case Number: CV08-02690 CW |
| Plaintiff, | **CERTIFICATE OF SERVICE** |
| v. | |
| ATHONY HEDGPETH et al, | |
| Defendant. | |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on February 22, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Christopher Lee Crawford V98835
Kern Valley State Prison
P.O. Box 5102
Delano, CA 93216

Dated: February 22, 2011

Richard W. Wieking, Clerk
By: Nikki Riley, Deputy Clerk